1
2
3
4
5
6
7                        UNITED STATES DISTRICT COURT
8                       WESTERN DISTRICT OF WASHINGTON
                                  AT SEATTLE
9
   SALLY DUFF, *et al.*,
10
                    Plaintiffs,
11                                                    Case No.  C02-1347RSL
             v.
12                                                    ORDER REGARDING
   THE MCGRAW-HILL COMPANIES, INC.,                   CROSS MOTIONS FOR
13                                                    SUMMARY JUDGMENT
                    Defendant.
14

15

16

17                            **I.  INTRODUCTION**

18          This matter comes before the Court on cross motions for summary judgment.  Plaintiffs

19   Sally Duff and her two daughters, Beth Perry and Ruth Romer, filed a motion for partial

20   summary judgment alleging that defendant failed to pay them all royalties owed for the

21   MatchWord product (Dkt. #40).  In response, defendant The McGraw-Hill Companies, Inc.

22   ("MGH"), cross-moved for partial summary judgment on the same issue (Dkt. #48).  Defendant

23   also filed a motion for summary judgment regarding plaintiffs' other breach of contract claims

24   that defendant failed to cooperate and to properly market and sell MatchWord.  (Dkt. #45).

25

26

27
   ORDER REGARDING CROSS MOTIONS
28   FOR SUMMARY JUDGMENT - 1

1  Because the issues are related, the Court considers the motions together.[1]

2       For the reasons set forth below, the Court grants defendant's motions and denies

3  plaintiffs' motion for summary judgment.

## II.  DISCUSSION

### A.    Background Facts.

6       Plaintiffs created and developed educational software products including MatchWord,[2]

7  which was designed to break down children's books into phonics as an aid in teaching children

8  to read.  In January 2000, plaintiffs sold MatchWord and others products to The Wright Group

9  ("TWG"),[3] which was then a subsidiary of the Chicago Tribune.  The terms of the sale were

10 memorialized in an Asset Purchase Agreement (the "Agreement").

11      Plaintiffs allege that TWG breached the Agreement by failing to pay them all royalties

12 owed, failing to cooperate and meet periodically with them, and failing to market MatchWord in

13 good faith and in a commercially reasonable manner.

### B.    Summary Judgment Standard.

15      On a motion for summary judgment, the Court must "view the evidence in the light most

16 favorable to the nonmoving party and determine whether there are any genuine issues of material

17 fact."  Holley v. Crank, 386 F.3d 1248, 1255 (9th Cir. 2004).  All reasonable inferences

18 supported by the evidence are to be drawn in favor of the nonmoving party.  See Villiarimo v.

19 Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  "[I]f a rational trier of fact might

20 resolve the issues in favor of the nonmoving party, summary judgment must be denied."  T.W.

---

[1]  Because this matter can be decided on the memoranda, declarations, and exhibits submitted by the parties, defendant's request for oral argument is DENIED.

[2]  On June 21, 2005, the Court dismissed plaintiffs' claims regarding products other than MatchWord.

[3]  After the parties executed the Agreement, TWG was acquired by MGH; as a result, MGH succeeded to TWG's rights and obligations under the Agreement.  For consistency, the Court will refer to defendant as "TWG" as the parties did in their memoranda.

1   Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

2   **C.     Length of Royalty Period.**

3          The Agreement requires TWG to pay plaintiffs royalties of 10% of the net proceeds of

4   MatchWord sales.  TWG's obligation to pay royalties began "on the date of Buyer's first sale of

5   the respective product and shall cease accruing 5-1/2 years thereafter."  Agreement at ¶ 2.3.3.

6   Plaintiffs argue that TWG breached the contract by ceasing royalty payments in July 2005; they

7   argue that they should have continued to receive royalties until July 2006.

8          The facts underlying the disagreement are not in dispute.  Pursuant to the Agreement,

9   TWG acquired total ownership of MatchWord as of January 30, 2000.   At that time, Duff and

10  TWG entered into an agreement for Duff to work as a consultant for TWG.  Duff had previously

11  used an independent salesperson, Diann DeRock, to sell MatchWord; Duff paid DeRock

12  commissions.  When the Agreement was executed, DeRock had some upcoming sales

13  appointments for MatchWord.  Duff asked TWG whether DeRock should keep the

14  appointments, and TWG instructed that she do so.  DeRock was able to sell $48,373.40 worth of

15  MatchWord after TWG obtained the ownership rights.  The parties' disagreement centers on

16  whether those sales were sales by Duff or sales by TWG that would trigger the beginning of the

17  royalty period.

18         Duff argues that she made the sales, so they do not constitute "Buyer's first sale" under

19  the Agreement.  As a corporate entity, TWG cannot make a sale itself; it must rely on others,

20  including its employees and agents, to do so on its behalf.  Duff argues that DeRock was

21  working for her, not TWG, so the sale cannot be TWG's sale.  The facts, however, show that

22  DeRock sold MatchWord on TWG's behalf, not on plaintiffs' behalf.  TWG was the sole owner

23  of MatchWord at the time the sales were made.  Not only did plaintiffs not retain any ownership

24  rights, but they were prohibited from selling MatchWord on their own behalf by their non-

25  competition agreements.  Presumably, if plaintiffs had truly believed that they were selling

26  MatchWord for their own benefit, they would have retained all of the proceeds from the 2000

27

28  ORDER REGARDING CROSS MOTIONS
    FOR SUMMARY JUDGMENT - 3

1   sales rather than forwarding those proceeds to TWG.

2       Furthermore, TWG expressly authorized DeRock to sell MatchWord after execution of

3   the Agreement, DeRock knew that the product was owned by TWG, and she informed her

4   customers of that fact.  Romer Dep. at p. 50 (explaining that TWG's president authorized

5   DeRock to continue selling MatchWord for six months after execution of the Agreement); Duff

6   Dep. at p. 100; DeRock Dep. at pp. 94-96; Declaration of Sally Duff (Dkt. #42) at ¶ 7

7   (explaining that DeRock made the post-Agreement sales calls "with TWG's full knowledge and

8   blessings").  Actual authority is established based on the objective manifestations of the

9   principal.  "The manifestations to the agent can be made by the principal directly, or by any

10  means intended to cause the agent to believe that he is authorized or which the principal should

11  realize will cause such belief."  See, e.g., Blake Sand & Gravel, Inc. v. Saxon, 98 Wn. App. 218,

12  223 (1999) (quoting Restatement (Second) of Agency §26, cmt. b).  TWG's permission for

13  DeRock to sell its product and DeRock's doing so are sufficient to show an agency relationship.

14  Although plaintiffs argue that they paid DeRock, they did so based solely on expediency.

15  Plaintiffs collected the revenues from the sales, deducted their costs, including DeRock's

16  commissions, then forwarded the remaining amount of $24,201.09 to TWG.  However, because

17  TWG owned the product, the payment was made from *its* revenues.  Accordingly, TWG, not

18  Duff, actually paid DeRock's commissions on the sales.  These factors show that DeRock was

19  acting as TWG's agent, so her sales were its sales.

20      Plaintiffs also note that TWG stated in discovery responses that when the Agreement was

21  executed, MatchWord was "not in a condition to be marketed or sold under [TWG's] name."

22  Declaration of Mark Rosencrantz (Dkt. #41), Ex. C at p. 11.  Plaintiffs argue that the statement

23  is an admission that TWG neither wanted to sell MatchWord in 2000 nor did so.  The fact that

24  TWG did not believe that the product was in a condition to be sold *under its own name* does not

25  undermine the fact that TWG's agent sold MatchWord at its direction and on its behalf in 2000.

26      Finally, TWG paid plaintiffs royalties on the 2000 sales, undermining plaintiffs'

27

28  ORDER REGARDING CROSS MOTIONS
    FOR SUMMARY JUDGMENT - 4

1  argument that the royalty period did not begin until 2001.  After receiving the $24,201.09 from

2  plaintiffs,[4] TWG sent them a May 10, 2001 letter listing a payment owed as "ROYALTIES

3  EARNED from MatchBook Systems for Feb-June 2000 $4837.34," which was 10% of the net

4  proceeds of the sales from February to June 2000.  Declaration of Robert Simons (Dkt. #49), Ex.

5  B.  TWG sent plaintiffs a check in June 2001 for the royalties plus a consulting payment, and

6  plaintiffs cashed the check.[5]  Plaintiffs are estopped from arguing that the $4,837.34 payment

7  was not a royalty because they accepted and retained the royalty payment, clearly identified as

8  such, based on the 2000 revenues.  For all of these reasons, the Court finds that TWG did not

9  breach the contract regarding royalty payments for MatchWord.

10  **D.      Other Royalty Issues.**

11          Plaintiffs alleged that they should have been paid a royalty rate of 10% on the

12  MatchWord Teachers' Guide.  TWG argued in its motion that the Guide was a derivative

13  product, entitling plaintiffs to royalties of 5% under the Agreement.  Plaintiffs did not respond to

14  defendant's argument, so summary judgment is appropriate on that claim.

15          Plaintiffs also argue that they did not receive royalties for MatchWord sales when that

16  product was sold as part of a "bundled" product with other products.  Plaintiffs' contention is

17

18  —————————————

19          [4] Plaintiffs argue that because they retained approximately $24,000 of the revenues to
    cover their costs and because they, not TWG, collected the money for the 2000 sales, the

20  "revenues from 2000 sales of MatchWord are outside the definition of 'Net Revenues' and
    hence not subject to the royalty provisions of the Agreement at all."  Plaintiffs' Reply at p. 4.

21  The fact that TWG apparently gave plaintiffs a windfall in allowing them to retain more than
    their contractually allotted portion of the proceeds does not change the fact that it also paid

22  plaintiffs the contractually required 10% royalty on the total revenue amount.

23

24          [5] Two additional factors undermine plaintiffs' current argument.  Romer admitted during
    her deposition that sales of MatchWord triggering the royalty period began in January 2000 after

25  the Agreement was signed, and she expected to receive royalties for 5-1/2 years after that time.
    Romer Dep. at p. 78.  Also, plaintiffs sought to include in the Agreement a minimum sales

26  amount to trigger the five-year warranty period, but a trigger was not included.  Declaration of
    Gavin Skok (Dkt. #47) at Ex. F.

27

28  ORDER REGARDING CROSS MOTIONS
    FOR SUMMARY JUDGMENT - 5

1   based on the fact that each TWG product is assigned a unique ISBN number, MatchWord was

2   sold as a stand-alone product and as part of a bundle, MatchWord and the bundle each has its

3   own ISBN number, and plaintiffs' royalty statements only listed royalties paid under the

4   MatchWord ISBN number.  TWG explained, however, that its royalty system "explodes" each

5   bundle into its component pieces, then tracks each component based on its own ISBN number.

6   Royalties are then calculated and paid using the individual product ISBN.  Because plaintiffs

7   have offered nothing more than speculation, they have not shown that TWG failed to pay them

8   royalties for the bundled copies of MatchWord.

9   **E.    Obligation to Meet and Discuss MatchWord.**

10          Plaintiffs argue that the Agreement required TWG to periodically meet and discuss how

11  MatchWord was being marketed and sold.  As an initial matter, plaintiffs' allegation of lack of

12  cooperation fails because plaintiffs did not plead it.  Even if plaintiffs were permitted to pursue

13  the claim at this late date, the Agreement's plain language does not require periodic meetings or

14  discussions about TWG's general marketing efforts.  The Agreement provides:

15          **7.2   Cooperation Regarding Product and Market Development.**  Buyer will cooperate
        in good faith with Sellers to periodically reexamine the definitions of Matchbook Systems

16      Products to take into consideration changes (technological or otherwise) in the market for
        products competitive with MatchBook Systems Products and the marketing and sale of

17      such products, such that as between Buyer and Sellers a fair and equitable (based on the
        percentages set forth in Sections 2.3.1 and 2.3.2 hereof) allocation of revenue is

18      maintained throughout the term of the applicable Royalty Periods for products and
        materials (including methods of marketing and sales) developed after the Closing Date;

19

20  The provision's language requires cooperation to periodically reexamine the definitions of

21  Matchbook Systems Products and whether they should be updated to reflect market changes.

22  Both the language of the provision and its title reflect its concern for an equitable distribution of

23  royalties for subsequently developed or modified products rather than the broader obligation

24  plaintiffs suggest.  Furthermore, plaintiffs have not identified any examples of TWG's failure to

25  cooperate to reexamine those definitions.  Instead, they argue that if TWG had met to discuss

26  marketing with them, sales of MatchWord would have improved.  However, as set forth more

27  fully below, TWG maintained broad discretion to determine how to market the products, and

28  ORDER REGARDING CROSS MOTIONS
    FOR SUMMARY JUDGMENT - 6

that discretion was not subject to plaintiffs' involvement or approval.  Accordingly, TWG did

not breach paragraph 7.2 of the Agreement.

**F.      Marketing Efforts.**

Plaintiffs argue that TWG violated its obligation to use good faith and commercially

reasonable efforts to market MatchWord.  The Agreement provides:

> **2.3.6  Publisher's Discretion.**  Buyer shall have absolute and sole discretion on all
> matters regarding the manner and extent of development, publication, marketing, sale,
> licensing and distribution of the above products.

> **7.1  Marketing and Promotion by Buyer.**  Buyer covenants and agrees that, during the
> relevant Royalty Periods, Buyer shall: (a) in good faith and with reasonable diligence, use
> commercially reasonable efforts to manufacture, produc[e], market and distribute
> MatchBook Systems Products, subject at all times to Buyer's right to manage its business
> in its sole and absolute discretion with or without regard to prevailing economic or other
> business conditions . . . .

Agreement at pp. 4-5, 12-13.  TWG has provided evidence that its efforts to promote and market

MatchWord were commercially reasonable.  Declaration of Ronald Fortune, Ph.D. (Dkt. #46) at

¶¶ 2, 4 (describing his ten years of experience as an executive at the largest software publishing

company; opining that TWG's efforts "met or exceeded industry custom and practice for

marketing and selling MatchWord"); id. at ¶¶ 7-11 (describing TWG's efforts to promote and

advertise MatchWord and to respond to changing market conditions).

In response, plaintiffs have provided examples of efforts they believe TWG should have

engaged in and alleged deficiencies in its efforts.[6]  Those examples, however, are insufficient to

create an issue of fact for two reasons.  First, plaintiffs' opinions lack a proper foundation.

Plaintiffs do not have any meaningful experience or expertise in marketing software or

educational products.  Duff Dep. at p. 23 (explaining that their own sales prior to hiring DeRock

---

[6] Plaintiffs did not dispute TWG's argument that their damages expert, Neil Beaton, was
not employed to opine about whether TWG's efforts were commercially reasonable and that he
lacked a foundation to opine on that topic.

ORDER REGARDING CROSS MOTIONS
FOR SUMMARY JUDGMENT - 7

were "incidental" and "minimal"); id. at p. 114 (responding, "I'm not a marketer. I don't know" when asked whether a company must consider the competition in its marketing decisions); Romer Dep. at p. 17.  Instead, they are teachers and a computer programmer who developed the software and used a third party to sell it.  Although they believe that TWG should have been able to sell more MatchWord, they did not know what TWG did to sell MatchWord or how much money it spent.  Duff Dep. at pp. 93, 216; Romer Dep. at p. 132.  They opined that TWG should have been able to sell significant quantities of MatchWord in various foreign countries, but their estimates were based on speculation rather than actual sales, data, or market research. Duff Dep. at p. 218 (agreeing that plaintiffs' sales projections were based on "a number picked out of the air").  Without some foundation for their opinions, plaintiffs' opinions do not show that TWG's efforts were commercially unreasonable.

Second, the Agreement grants TWG "absolute and sole discretion on all matters regarding the manner and extent of development, publication, marketing, sale, licensing and distribution of the above products."  Agreement at 2.3.6; see also Duff Dep. at pp. 102-03 (acknowledging that because TWG owned the products, it had the right to choose how they wanted to market them); Romer Dep. at p. 93.  Pursuant to that broad grant of discretion, TWG was entitled to determine the manner and extent of marketing, and the fact that plaintiffs disagreed with those efforts is irrelevant.  In fact, plaintiffs sought to include performance guarantees in the Agreement, but TWG refused.  Romer Dep. at p. 67.  Finally, plaintiffs have not offered any evidence to show that TWG engaged in bad faith,[7] and the fact that TWG's efforts were commercially reasonable fatally undermines that argument.

### III.  CONCLUSION

For all of the foregoing reasons, the Court DENIES plaintiffs' motion for partial summary

---

[7] For example, plaintiffs do not argue that TWG intentionally delayed marketing MatchWord to deprive them of royalties.  Duff Dep. at p. 101.

ORDER REGARDING CROSS MOTIONS
FOR SUMMARY JUDGMENT - 8

judgment (Dkt. #40), GRANTS defendant's cross motion for partial summary judgment (Dkt. #48), and GRANTS defendant's motion for summary judgment (Dkt. #45).  The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiffs.

DATED this 28th day of July, 2006.


_MM S Lasnik_
Robert S. Lasnik
United States District Judge

ORDER REGARDING CROSS MOTIONS
FOR SUMMARY JUDGMENT - 9